United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SON CHENG,

          Plaintiff,

  v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

          Defendant
_____/

No. C-05-00473 MMC

**ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT; DENYING DEFENDANT'S
CROSS-MOTION FOR SUMMARY
JUDGMENT; REMANDING ACTION**

18

19

20

21

22

     Before the Court is plaintiff Son Cheng's motion for summary judgment or, in the

alternative, for remand; the Commissioner of the Social Security Administration's

("Commissioner") opposition and cross-motion for summary judgment; and plaintiff's reply.

Having considered the papers filed in support of and in opposition to the motions, the Court

rules as follows.[1]

23

                                   **BACKGROUND**

24

**A.  Procedural History**

25

     Plaintiff Son Cheng brings this action under 42 U.S.C. § 405(g) for judicial review of a

26

final decision of the Commissioner.  Plaintiff alleges she is a 60 year-old Cambodian woman

27

28

      [1] Pursuant to the local rules of this district, the motions have been submitted on the
papers without oral argument.  <u>See</u> Civil L.R. 16-5.

1    who fled the Khmer Rouge regime in 1979, and emigrated to the United States in 1984.  (See

2    Certified Transcript of Administrative Proceedings ("Tr.") at 142.)  Plaintiff has held only one

3    substantial job since arriving in the United States: packaging Halloween costumes during

4    2000 and 2001.  (See Tr. at 16, 32, 102.)

5         On August 12, 2002, plaintiff, who was then 57 years old, filed with the Social Security

6    Administration ("SSA") an application for Supplemental Security Income ("SSI") benefits,

7    alleging therein and in an accompanying Disability Report that she has been unable to work

8    since September 1, 2001, as a result of "headache[s], backpain, polyarthralgia, poor vision,

9    memory loss, energy loss, depression, post-traumatic stress, [and] phobia."  (See Tr. at 101.)

10   After the SSA denied plaintiff's application, both initially, (see Tr. at 65-68), and on

11   reconsideration, (see Tr. at 70-73), plaintiff requested a hearing before an administrative law

12   judge ("ALJ"), (see Tr. at 74), and retained an attorney, (see Tr. at 75-78).  On May 11, 2004,

13   the ALJ conducted a hearing, at which time the ALJ heard testimony from plaintiff and

14   plaintiff's daughter, Sokham Mok ("Mok").  (See Tr. at 23-62.)

15        On May 28, 2004, the ALJ issued a decision, finding plaintiff's depression to be

16   "severe," but that it does not preclude her from "perform[ing] her past relevant work as a

17   packager," and, consequently, she is not disabled and not entitled to SSI benefits.  (See Tr. at

18   15-22.)  The ALJ analyzed plaintiff's claim using the SSA's five-step evaluation process.  See

19   20 C.F.R. § 404.1520.[2]  At the first step, the ALJ found plaintiff had not engaged in substantial

20   gainful activity since at least September 1, 2001.  (See Tr. at 16.)  At the second step, the ALJ

21

22   _____

     [2] "The Commissioner follows a five-step sequential evaluation process in assessing
     whether a claimant is disabled.

23        Step one: Is the claimant engaging in substantial gainful activity?  If so, the claimant is
     found not disabled.  If not, proceed to step two.

24        Step two: Does the claimant have a "severe" impairment?  If so, proceed to step three.
     If not, a finding of not disabled is appropriate.

25        Step three: Does the claimant's impairment or combination of impairments meet or
     equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is
     automatically determined disabled.  If not, proceed to step four.

26        Step four: Is the claimant capable of performing his past work?  If so, the claimant is not
     disabled.  If not, proceed to step five.

27        Step five: Does the claimant have the residual functional capacity to

28   perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled."
     McCartey v. Massanari, 298 F.3d 1072, 1074 n. 6 (9th Cir.2002).

2

1   found plaintiff does suffer from a "severe" mental impairment, namely major depression, but

2   that her physical impairments were not "severe."  (See id.)  Under the third step, the ALJ found

3   plaintiff's impairments do not equal the criteria of the listed impairments.  (See Tr. at 17-18.)

4   Finally, at step four, the ALJ found plaintiff is capable of performing her past work, and

5   therefore not disabled as a result of her depression.  (See Tr. at 21.)

6          Plaintiff next filed a request with the Appeals Council, seeking review of the ALJ's May

7   28, 2004 decision.  (See Tr. at 11.)  After the Appeals Council denied plaintiff's request for

8   review, (see Tr. at 6-9), plaintiff filed the instant action.  Plaintiff challenges herein only the

9   ALJ's finding as to her alleged mental disability; she does not challenge the ALJ's finding as

10  to her alleged physical disability.

11  **B. Plaintiff's Psychiatric Treatment History**

12          **1. Dr. Ta**

13          Plaintiff began treatment with a psychiatrist, Tuong-Vi Ta, M.D. ("Dr. Ta"), in August

14  2002.  (See Tr. at 204-13.)  In a report prepared for Alameda County Behavioral Health Care

15  Services, dated September 15, 2002, Dr. Ta diagnosed plaintiff with "major depression," and

16  described plaintiff's affect as "within normal limits," her thought process as "slow" and

17  "simplistic," and her thought content as indicating "hopelessness" with "no desire, no goal."

18  (See Tr. at 149.)  Dr. Ta rated plaintiff's Global Assessment of Functioning ("GAF") score at

19  50,[3] and noted that plaintiff was "cooperative."  (See id.)  Throughout the course of treating

20  plaintiff, Dr. Ta frequently described plaintiff's condition as "stable."  (See Tr. at 206, 209, 210,

21  211.)

22  //

23          **2. Dr. Gracer**

24          Plaintiff began visiting Jewish Family and Children Services of the East Bay ("JFCS")

25

26          [3] "Clinicians use a GAF to rate the psychological, social, and occupational functioning
    of a patient."  Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595,
27  598 n. 1 (9th Cir. 1999).  "A GAF between 41 and 50 indicates serious symptoms (e.g.
    suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in
28  social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.

1   in July 2002, to obtain counseling from a mental health paraprofessional.  (See Tr. at 214-16.)

2   In September 2003, plaintiff met once with James Gracer, M.D. ("Dr. Gracer"), a psychiatrist

3   who saw clients from JFCS on a volunteer basis.  (See Tr. at 214, 221.)  Dr. Gracer noted

4   plaintiff's depression and that she had no "plan or intent."  (See id. at 221.)  He also reported

5   problems concerning plaintiff's relationship with her daughter, and noted that plaintiff only slept

6   two to three hours per night. (See id.)  Dr. Gracer prescribed Lexapro and Trazodone to help

7   plaintiff sleep.  (See id.)

8         **C. Examining Psychologists**

9             **1. Dr. Khoi**

10        On September 5, 2002, Sokley Khoi, Ph.D. ("Dr. Khoi"), a licensed psychologist,

11   performed a "Neuropsychological Screening Evaluation" of plaintiff on behalf of the SSA.

12   (See Tr. at 18, 57, 142-45.)  Plaintiff told Dr. Khoi that she is able "to wash and dress herself,

13   fix meals, do laundry, take public transportation, and do limited household chores," but stated

14   that "she lacks motivation in performing these activities."  (See Tr. at 142.)  Plaintiff reported

15   she suffered from "headache, chest pain, and low back pain" and further stated: "I'm

16   depressed, I forget a lot, I can't concentrate, I always feel really stressed . . . I've been having a

17   lot of nightmares."  (See id.)  Dr. Khoi noted that plaintiff's affect was "blunted," and that she

18   was unable to perform "serial sevens."  (See Tr. at 143.)  Plaintiff reported "intrusive thoughts,

19   nightmares, flashbacks, irritability, being easily startled, hypervigilance, and avoidance of

20   stimuli that remind her of her experiences" with the Khmer Rouge.  (See id.)

21        Dr. Khoi tested plaintiff's nonverbal intelligence using the TONI-3 test and reported

22   plaintiff's ability as "poor"; Dr. Khoi also tested plaintiff's "visuo-construction/organicity" using

23   the Bender-Gestalt Test and found plaintiff to be "in the impaired range and characteristic of

24   organic impairment"; finally, Dr. Khoi tested plaintiff for malingering using the Rey 15-Item Test

25   and found plaintiff had "adequate motivation and effort."  (See Tr. at 144.)  Dr. Khoi diagnosed

26   plaintiff with major depression and post-traumatic stress disorder.  (See Tr. at 144.)

27   Additionally, Dr. Khoi concluded that plaintiff was not impaired in her "[a]bility to follow simple

28   instructions"; mildly impaired in her "[a]bility to maintain adequate pace or persistence to

4

perform one or two step simple repetitive tasks"; mildly to moderately impaired in her "[a]bility

to maintain adequate attention/concentration"; mildly to moderately impaired in her "[a]bility to

adapt to changes in job routine"; markedly impaired in her "[a]bility to withstand the stress of a

routine work day"; and moderately to markedly impaired in her "[a]bility to interact

appropriately with co-workers, supervisors, and [the] public on a regular basis." (See Tr. at

145.) Aside from noting these impairments in abilities relevant to the workplace, Dr. Khoi did

not opine as to whether plaintiff could perform any type of work.

### 2. Dr. Afary

Mona Afary, Ph.D. ("Dr. Afary") examined plaintiff on one occasion in connection with

plaintiff's treatment at JFCS, (see Tr. at 216), for purposes of performing a "disability

evaluation," (see Tr. at 214). In a report dated April 29, 2004, Dr. Afary described plaintiff's

affect as "depressed, anxious, and hopeless," and found her attitude to be "resigned and

gullible." (See Tr. at 218.) Dr. Afary reported that plaintiff "does not cook" and "does not

socialize with anyone." (See Tr. at 219.) Dr. Afary noted that plaintiff "does not feel safe

among a group of people," and that "[k]eeping attendance, work schedules, making decisions

and relating to co-workers and supervisors seem impossible to her." (See Tr. at 219.) Dr.

Afary found that plaintiff was "forgetful and unable to concentrate," and diagnosed her with

major depression. (See Tr. at 218-19.) Dr. Afary rated plaintiff's GAF score at 45 and stated

that plaintiff's prognosis was "poor" and that she "is not able to work and keep a job." (See Tr.

at 220.)

### D. Nonexamining Psychiatric Assessment

#### 1. Dr. Gragg

A state agency medical consultant, T.M. Gragg, M.D. ("Dr. Gragg"), reviewed plaintiff's

file on September 27, 2002, and prepared two reports, one titled "Mental Residual Functional

Capacity Assessment," and the other titled "Psychiatric Review Technique." (See Tr. at 151-

163.) In one of the two reports, Dr. Gragg found plaintiff's social functioning was "moderately"

impaired and that she "often" had "deficiencies of concentration, persistence or pace resulting

in failure to complete tasks in a timely manner." (See Tr. at 162.) In the other report, however,

1   Dr. Gragg rated plaintiff as "not significantly limited" in "social interaction" or in her ability to

2   "maintain attention and concentration for extended periods." (See Tr. at 151-52.)  Dr. Gragg

3   noted plaintiff's history of post-traumatic stress disorder and depression, yet concluded that

4   plaintiff is capable of performing simple repetitive tasks.  (See Tr. at 153.)

5           **2.  Dr. Chokatos**

6        After plaintiff's request for reconsideration, John Chokatos, M.D. ("Dr. Chokatos"),

7   reviewed the evidence in plaintiff's medical file, including the report of Dr. Khoi, and affirmed

8   Dr. Gragg's assessment that plaintiff nonetheless was capable of performing simple repetitive

9   tasks.  (See Tr. at 64, 166.)

10                      **STANDARD OF REVIEW**

11        The Commissioner's denial of disability benefits will not be disturbed if it is supported

12   by substantial evidence and based on the application of correct legal standards.  See

13   Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.1998).  "Substantial evidence means more

14   than a mere scintilla, but less than a preponderance; it is such relevant evidence as a

15   reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53

16   F.3d 1035, 1039 (9th Cir.1995).  If the evidence is susceptible of more than one rational

17   interpretation, the reviewing court will uphold the decision of the ALJ.  See id.

18                        **DISCUSSION**

19        Plaintiff contends in her motion for summary judgment that the ALJ erred in finding she

20   was not disabled because of her severe depression.  Plaintiff argues the ALJ erred by: (1)

21   improperly discounting plaintiff's testimony; (2) rejecting the testimony of plaintiff's daughter,

22   Mok, without providing adequate reasons; and (3) improperly discounting the opinions of

23   plaintiff's treating and examining physicians and psychologists without providing adequate

24   reasons.

25        **A.  The ALJ's Rejection of Plaintiff's Testimony**

26        Plaintiff testified that for "four or five day[s]" per week, her depression prevents her from

27   leaving her bedroom, cooking for herself, and talking to people.  (See Tr. at 48-49.)  The ALJ

28   found plaintiff was not credible and "not . . . to be as impaired as she claims."  (See Tr. At 19.)

1   Although the ALJ is responsible for determining credibility and resolving ambiguities, his

2   findings "must be supported by specific, cogent reasons." <u>See</u> <u>Reddick</u>, 157 F.3d at 722.

3   "Unless there is affirmative evidence showing that the claimant is malingering, the

4   Commissioner's reasons for rejecting the claimant's testimony must be 'clear and

5   convincing.'" <u>Id.</u> Moreover, "[g]eneral findings are insufficient; rather, the ALJ must identify

6   what testimony is not credible and what evidence undermines the claimant's complaints." <u>See</u>

7   <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996).  As noted above, Dr. Khoi specifically

8   tested for malingering using the Rey 15-Item Test, and found adequate motivation and effort.

9   (<u>See</u> Tr. at 144.)  No medical practitioner reported any sign of malingering.  Accordingly, the

10   ALJ's reasons for rejecting plaintiff's testimony must be "clear and convincing."  <u>See</u> <u>Reddick</u>,

11   157 F.3d at 722.

12      "To determine whether the claimant's testimony regarding the severity of her symptoms

13   is credible, the ALJ may consider, for example: (1) ordinary techniques of credibility

14   evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning

15   the symptoms, and other testimony by the claimant that appears less than candid; (2)

16   unexplained or inadequately explained failure to seek treatment or to follow a prescribed

17   course of treatment; and (3) the claimant's daily activities." <u>See</u> <u>Smolen v. Chater</u>, 80 F.3d

18   1273, 1284 (9th Cir. 1996).  When evaluating the credibility of symptom testimony, the ALJ

19   must consider "the claimant's work record and observations of treating and examining

20   physicians and other third parties regarding, among other matters, the nature, onset, duration,

21   and frequency of the claimant's symptom; precipitating and aggravating factors; functional

22   restrictions caused by the symptoms; and the claimant's daily activities." <u>See</u> <u>id.</u>

23      Here, the ALJ listed several reasons in support of his finding that plaintiff was not

24   credible: (1) plaintiff's allegedly disabling physical impairments did not appear in medical

25   records until the time she applied for benefits, (<u>see</u> Tr. at 19); (2) plaintiff told the SSA in

26   December 2002 that she was unable to work due to "hallucinations," despite medical reports

27   stating that she did not suffer from hallucinations, (<u>see</u> <u>id.</u>); (3) plaintiff claimed to have

28   permanently injured her back in the late 1970s to the extent that she can no longer lift anything,

yet she worked in 2000 and 2001 (see id.); (4) Burton Brody, M.D. ("Dr. Brody"), who examined plaintiff on behalf of the SSA to evaluate her physical disability, observed that plaintiff "tended to answer positively to any symptom mentioned, without any actual diagnoses," (see id.); and (5) plaintiff told the SSA she left her packaging job in San Diego because it was difficult to work with pain, yet told Dr. Khoi she left because she was laid off, and told Dr. Brody she quit to return to the Bay Area, (see id.).

### 1. Timing of Treatment for Physical Impairments in Relation to Application for Benefits

The ALJ stated that although plaintiff "alleges a [physical] disability onset date of September 1, 2001, her medical records are all after August 12, 2002, the date of her application for benefits." (See Tr. at 17.) The ALJ opined, "[i]t is just too coincidental that, in the absence of any accident or other triggering event, the claimant would suddenly develop disabling impairments just around the time that she filed her claim for benefits." (See id.) Plaintiff does not dispute her lack of medical records before August, 2002. Plaintiff, however, explained to Dr. Brody that she "had no medical attention over the past years, with no diagnosis, being unable to afford medical care." (See Tr. at 139.) Moreover, during her testimony before the ALJ, plaintiff stated that once she moved to Oakland, she obtained Medicare and sought treatment. (See Tr. at 39 ("When I come to Oakland I applied for Medicare so I go to check it out").) "Where a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so." Smolen, 80 F.3d at 1284. The ALJ's decision fails to take into account plaintiff's stated reasons for the absence of medical records prior to August 2002.

### 2. Hallucinations and Inability to Lift

The ALJ noted that a Reconsideration Disability Report filed with the SSA in connection with plaintiff's request for reconsideration, signed by plaintiff and dated December 9, 2002, (see Tr. at 19, 114-15), states she is "unable to perform any work due to, inter alia, "hallucinations"; the ALJ further noted there is "no indication from the claimant's treatment records, Dr. Khoi's report, or Dr. Ta's notes, that the claimant experiences hallucinations in

1    any form." (See Tr. at 19 (emphasis in original).)

2         Plaintiff states in her motion, albeit without citation to evidence in the record, that she

3    cannot read or write English, and that she relied on "some other person" to fill out the report.

4    (See Pl.'s Mot. for Summ. J. at 20.)  Plaintiff testified that she has dreams about her past: "I

5    dream sometime I see my mom to call me.  Sometime I see the people that [INAUDIBLE] in

6    1975 they call me go to work."  (See Tr. at 37.)  Similarly, Dr. Afary notes that plaintiff told her:

7    "I see my mother in my sleep calling for me from her grave."  (See Tr. at 216.)  Given plaintiff's

8    less than complete fluency in English, as demonstrated by her testimony at the hearing, the

9    reference in the Reconsideration Disability Report to "hallucinations" is not particularly

10   probative of plaintiff's credibility.

11        The ALJ also found plaintiff lacked credibility by reason of her statements "that she

12   permanently injured her back in Cambodia in the late 70's carrying 80 kilos of rice and that

13   she now cannot lift anything, even though she was well able to work in 2000 and 2001."  (See

14   Tr. at 19.)  Plaintiff argues that a literal meaning of plaintiff's statement, that she "cannot carry

15   anything," (see Tr. at 215), is implausible as it would mean she was not capable of even

16   dressing herself.  Additionally, plaintiff notes she made the statement to Dr. Afary for purposes

17   of obtaining a mental evaluation, not for purposes of determining the extent of any physical

18   impairment.  (See Pl.'s Mot. for Summ. J. at 17.)  Moreover, plaintiff notes that in her

19   application for SSI benefits, she reported to the SSA that her previous job required her to lift

20   no more than ten pounds.  Contrary to the ALJ's decision, there is no significant inconsistency

21   between plaintiff's statement to Dr. Afary about her back injury and her history of light work in

22   2000 and 2001.

23                          **3.  Dr. Brody's Observation**

24        The ALJ further found plaintiff's credibility to be "strained," with respect to her claim of

25   mental disability, in light of Dr. Brody's observation that plaintiff "tended to answer positively to

26   any symptom mentioned, without any actual diagnoses."  (See Tr. at 19.)  Dr. Brody's

27   assessment is particularly relevant with respect to plaintiff's asserted physical impairments.

28   With respect to plaintiff's mental impairments, however, the ALJ failed to acknowledge that Dr.

9

1   Khoi specifically tested plaintiff for malingering, using the Rey 15-Item test, and found

2   "adequate motivation and effort." (See Tr. at 144.)  There is no medical opinion or medical

3   evidence contradicting this test result.  The opinion of an examining physician "can only be

4   rejected for specific and legitimate reasons that are supported by substantial evidence in the

5   record."  See Lester, 81 F.3d at 830-31.  Here, the ALJ failed to provide any reason for failing

6   to credit Dr. Khoi's assessment.

7                          **4. Plaintiff's Reasons for Leaving San Diego**

8          The ALJ also questioned plaintiff's veracity because of disparities among her stated

9   reasons for leaving San Diego and returning to Oakland. (See Tr. at 19.)  As noted by the

10   ALJ, plaintiff told the SSA "that she left her job because it was difficult for her to work with pain

11   [see Tr. at 101], while the same month she told Dr. Khoi that she left her job because she was

12   laid off [see Tr. at 143], and the next month she told Dr. Brody that she quit her job to come to

13   the Bay Area [see Tr. at 139]." (See Tr. at 19.)

14          Plaintiff argues that the statements at issue are not inherently inconsistent, as all three

15   accurately describe what happened.  Plaintiff's statements that she quit her job because of

16   pain and in order to come to the Bay Area are not inherently inconsistent.  Although plaintiff's

17   statement that she was laid off does appear to be inconsistent with her statement that she quit

18   her job, the statements are reconcilable if plaintiff was laid off from her seasonal job and

19   decided not to return to work the following season.   Plaintiff testified that her packing job in

20   San Diego was seasonal, lasting "only six month[s]," (see Tr. at 33), and Dr. Brody's report

21   indicates that plaintiff came to the Bay Area in November 2001, shortly after the conclusion of

22   the Halloween season, (see Tr. at 139).  Plaintiff explained to the ALJ that when the job ended

23   for the season, she applied for unemployment and moved to Oakland. (See Tr. at 33.)

24   Nevertheless, the significance of the disparities noted by the ALJ  is not solely that the

25   statements are different, but also that plaintiff, when discussing with medical practitioners her

26   reasons for leaving her previous job, never mentioned that pain played any role in that

27   decision.  Again, however, this circumstance is more probative of plaintiff's physical disability

28   claim.  To the extent such evidence may be considered relevant as to plaintiff's general

1   character for honesty, and thus probative of plaintiff's mental disability claim, the ALJ, as

2   noted, nonetheless failed to discuss Dr. Khoi's finding that plaintiff was not malingering.

3          **5. Conclusion**

4        The ALJ improperly discounted plaintiff's credibility on the basis of plaintiff's

5   statements, as described above.  The ALJ noted no significant inconsistencies with respect to

6   plaintiff's reports as to the severity of plaintiff's mental impairments.  <u>See</u> <u>Smolen</u>, 80 F.3d at

7   1284 (listing inconsistent statements among factors ALJ may consider in assessing

8   credibility).  Most significantly, in assessing plaintiff's credibility, the ALJ failed to credit the

9   results of the standardized tests administered by Dr. Khoi, none of which suggest any reason

10  to question her credibility and, in fact, support a finding that she is not malingering.  Given the

11  medical evidence that plaintiff is not malingering with respect to her mental impairment, which

12  evidence the ALJ did not discuss in finding plaintiff lacked credibility, the ALJ's stated

13  reasons for finding plaintiff not credible are not "clear and convincing."  <u>See</u> <u>Reddick</u>, 157

14  F.3d at 722.

15      **B. Mok's Testimony**

16       Plaintiff argues that the ALJ rejected Mok's testimony as to plaintiff's mental condition

17  without providing any reason.  Mok testified that plaintiff awakens in the middle of the night,

18  "panicking," "sweaty," and out of breath.  (<u>See</u> Tr. at 53.)  Mok also testified that plaintiff cannot

19  cook for herself or do laundry, and that plaintiff frequently cries.  (<u>See</u> Tr. at 53-54.)

20       "Disregard of the testimony of friends and family members violates 20 C.F.R.      §

21  404.1513(c)(2)."  <u>Smolen</u>, 80 F.3d at 1288.  "[T]he ALJ can reject the testimony of lay

22  witnesses only if he gives reasons germane to each witness whose testimony he rejects."  <u>Id.</u>

23  Here, the ALJ did not reject Mok's testimony; rather, the ALJ found such testimony did not

24  provide "much other support for the claimant's claims that she cannot perform any work at all."

25  (<u>See</u> Tr. at 20.)  There was no dispute that plaintiff suffers from nightmares as Mok testified.

26  Mok's testimony did not, however, bear on the issue of plaintiff's ability to work.  Accordingly,

27  the Court finds the ALJ did not improperly disregard the testimony of plaintiff's daughter.

28

11

## C. The ALJ's Rejection of the Treating and Examining Mental Professionals' Assessments

The ALJ rejected the opinions of all of plaintiff's treating and examining psychiatrists and psychologists in favor of the opinions of nonexamining physicians.  In particular, the ALJ rejected the opinion of examining psychologist Dr. Afary, specifically, that plaintiff's severe depression and her GAF score of 45 rendered her "unable to work and keep a job." (See Tr. at 18, 220.)  The ALJ also rejected examining psychologist Dr. Khoi's opinion that plaintiff was markedly impaired in her ability to withstand the stress of a routine work day, and moderately to markedly impaired in her ability to interact appropriately with coworkers, supervisors and the public on a regular basis. (See Tr. at 19, 144.)  The ALJ also found unpersuasive treating physician Dr. Ta's diagnosis that plaintiff suffered from major depression and had a GAF score of 50.  Instead, the ALJ agreed with non-examining physician Dr. Gragg, who opined that plaintiff's depression limits her to the performance of "simple repetitive tasks only," and non-examining physician Dr. Chokatos, who affirmed Dr. Gragg's assessment. (See Tr. at 20-21.)  As a result, the ALJ found plaintiff not to be disabled, on the ground she could perform her past relevant work as a packager. (See Tr. at  21.)  Plaintiff argues that the ALJ erred by rejecting the opinions of Drs. Khoi, Afary, and Ta without providing adequate reasons.

### 1. Legal Standards

"Because treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians." Smolen, 80 F.3d at 1285 (citations omitted).[4]  Where the treating physician's opinion contradicts the opinion of an examining or consulting physician, the Commissioner must provide "'specific and legitimate reasons' supported by substantial evidence in the record" for rejecting the treating physician's opinion. See Lester, 81 F.3d at

---

[4]Psychologists are considered to be "acceptable medical sources" and their opinions are given the same weight as medical doctors. See 20 C.F.R. § 404.1527 (defining "medical opinions" as "statements from physicians and psychologists and other medical sources").

12

830 (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).  Likewise, "[t]he opinion of

an examining physician is, in turn, entitled to greater weight than the opinion of a

nonexamining physician" and, if controverted, "can only be rejected for specific and legitimate

reasons that are supported by substantial evidence in the record."  See Lester, 81 F.3d at

830-31.

### 2. Self-Reported Symptoms

Based on a battery of tests, Dr. Khoi concluded that plaintiff exhibited a "marked"

impairment to "withstand the stress of a routine work day."  (See Tr. at 144-45.)  Moreover, Dr.

Khoi specifically tested for malingering, using the Rey 15-Item Test, and found no indication

that plaintiff was malingering.  (See Tr. at 144.)  The ALJ nevertheless rejected Dr. Khoi's

opinion in favor of that of Drs. Gragg and Chokatos and, as a result, concluded plaintiff could

perform her past work as a packager.  (See Tr. at 21.)  The ALJ stated he was "suspicious of

Dr. Khoi's recitation of the claimant's Vegetative Signs/Symptoms and her PTSD symptoms

because these sound suspiciously like the claimant's 'tendency to answer positively [to] any

symptom mentioned' that was noted by Dr. Brody."  (See Tr. at 19.)  The ALJ attributed Dr.

Khoi's findings more to her "power of suggestion than to their real presence in claimant's life."

(See id.)  Plaintiff argues that the ALJ erred by failing to recognize or address the fact that Dr.

Khoi's opinion was based on the results of standardized psychological tests.

"A physician's opinion of disability premised to a large extent upon the claimant's own

accounts of his symptoms and limitations may be disregarded where those complaints have

been properly discounted."  Morgan, 169 F.3d at 602 (internal quotation and citation omitted).

When, however, a psychologist finds no malingering or deception, and conducts independent

psychological testing, the psychologist is not taking plaintiff's complaints "at face value."  See

Regennitter v. Commissioner of the Social Security Administration, 166 F.3d 1294, 1300 (9th

Cir. 1998) (holding psychologist should not be "faulted" for believing claimant's complaints

where no evidence of malingering and where findings are based on independent testing).  As

noted above, Dr. Khoi, who conducted a battery of tests, found no evidence of malingering,

despite specifically testing for it.  The ALJ failed to discuss Dr. Khoi's finding that plaintiff was

1  not malingering, and, consequently, has not set forth specific and legitimate reasons for

2  rejecting Dr. Khoi's opinion on the ground that it is based on self-reporting.

3                  **3. Treatment Records**

4         Next, plaintiff argues that the ALJ erred because the ALJ rejected the opinions of Drs.

5  Khoi and Afary on the ground such opinions were unsupported by ongoing treatment records.

6  In particular, the ALJ found the opinions of Drs. Khoi and Afary were "not supported by the

7  records of ongoing treatment the claimant received from 2002 through 2004 with Dr. Ta."

8  (See Tr. at 20.)  The ALJ further noted that "[a]lthough Dr. Khoi's August 2002 evaluation and

9  Dr. Afary's April 2004 report 'bookend' Dr. Ta's records, they are, interestingly, more similar

10  to each other than each is to Dr. Ta's monthly observations of the claimant."  (See id.)  In so

11  finding, the ALJ focuses on Dr. Ta's repeated description of plaintiff as "stable," deeming such

12  notations evidence that plaintiff was not suffering significant impairment.  (See Tr. at 20.)

13  "Stable," however, means "resisting sudden change of . . . condition."  See Webster's II New

14  College Dictionary 1073 (1995).  Dr. Ta, in a report prepared at Alameda County Behavioral

15  Health Services, diagnosed plaintiff "with major depression" and found her "to have significant

16  impairments in the area of life functioning."  (See Tr. at 149.)[5]  Dr. Ta's treatment notes, when

17  read in connection with the above-referenced report, suggest only that plaintiff's major

18  depression with significant impairments has not changed.  Consequently, the ALJ's rejection

19  of the opinions of Drs. Khoi and Afary, on the basis of Dr. Ta's finding, is not supported by the

20  record.            **4. Rejection of Dr. Ta's Opinion**

21         Plaintiff argues that the ALJ improperly ignored the opinion of Dr. Ta.  See Winans v.

22  Bowen, 853 F.2d 643, 647 (9th Cir. 1988) (holding failure of ALJ to give specific reasons for

23  ignoring treating physician's opinion constitutes grounds for reversal.).  As noted above, the

24  ALJ used Dr. Ta's notes as support for discounting the opinions of Drs. Khoi and Afary,

25  whereas Dr. Ta's records actually supported the opinions of Drs. Khoi and Afary.  In

26  concluding plaintiff could perform her past work, the ALJ makes no reference to Dr. Ta's rating

27   

28             [5]It is not clear whether the ALJ realized this report was authored by Dr. Ta, as the ALJ does not attribute it to him.  (See Tr. at 18.)

14

of plaintiff's GAF score at 50, which score, as noted earlier, reflects serious impairment.  As a result, the ALJ failed to provide "specific and legitimate" reasons for disregarding the opinion of Dr. Ta.

### 5.  Reliance on Opinion of Non-Examining Physicians

Other than his findings as to plaintiff's credibility, the ALJ's sole reason for rejecting the opinions of plaintiff's treating and examining physicians and psychologists is the ALJ's reliance on the opinion of two non-examining physicians.  "The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician."  Lester, 81 F.3d at 831 (emphasis in original); see also Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (holding "report of non-treating, non-examining physician, combined with the ALJ's own observance of claimant's demeanor at the hearing" did not constitute "substantial evidence").  Accordingly, Dr. Gragg's report, either alone or in combination with Dr. Chokatos' affirmation, does not constitute substantial evidence for purposes of refuting the opinions of Drs. Khoi, Afary, and Ta.  See Lester, 81 F.3d at 831.

### D.  Form of Relief

The Court has found that the ALJ failed to adequately explain his reasons: (1) for finding plaintiff not credible; (2) for rejecting the opinions of plaintiff's examining psychologists; and (3) for ignoring the opinion of plaintiff's treating physician.

Where the ALJ has improperly rejected relevant evidence, the Ninth Circuit has, on occasion, declined to "remand solely to allow the ALJ to make specific findings" regarding that evidence, and instead has credited the improperly rejected evidence as true and remanded solely for an award of benefits.  See Lester, 81 F.3d at 834 (internal quotation and citation omitted); see also Smolen, 80 F.3d at 1292 (holding court may remand for award of benefits "where the record has been fully developed and where further administrative proceedings would serve no useful purpose").  In other such instances, however, the Ninth Circuit has remanded for further proceedings rather than for an award of benefits.  See Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003) (stating: "We are not convinced that

15

the 'crediting as true' doctrine is mandatory in the Ninth Circuit."; discussing cases; remanding for reconsideration of claimant's pain testimony); see also Bunnell v. Barnhart, 336 F.3d 1112, 1115-16 (9th Cir. 2003) (remanding for reconsideration where, inter alia, ALJ "failed to provide adequate reasons for rejecting the opinion of the treating physicians" and "did not properly reject [the claimant's] subjective complaints").  In particular, those courts have remanded when "outstanding issues must be resolved before a proper determination can be made."  See id. at 1115.

In a case such as this, there are outstanding issues that must be resolved before a proper determination can be made.  As discussed, the ALJ found plaintiff can perform work involving "simple repetitive tasks," (see Tr. at 21), but failed to credit evidence that may bear on such finding.  Consequently, issues remain as to whether sufficient reasons in fact exist for the ALJ's ultimate determination.

Under such circumstances, the Court does not find "the record has been fully developed" or that "further administrative proceedings would serve no useful purpose."  See Smolen, 80 F.3d at 1292.  Accordingly, the Court will remand the action for further administrative proceedings to allow the ALJ to develop the record as necessary and set forth his conclusions.

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is hereby GRANTED in part, defendant's cross-motion for summary judgment is DENIED, and the matter is REMANDED for further proceedings consistent with this decision.

The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: December 19, 2005

MAXINE M. CHESNEY
United States District Judge

16